Tod F. Schleier
SCHLEIER LAW OFFICES, P.C.
3101 North Central Avenue, Suite 1090
Phoenix, AZ 85012-2640
State Bar No. 004612
Telephone: (602) 277-0157
Facsimile (602) 230-9250
tod@schleierlaw.com

David J. Marshall
Alexis Ronickher
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Telephone: (202) 299-1140
Facsimile: (202) 299-1148
marshall@kmblegal.com
ronickher@kmblegal.com
(pro hac vice pending)

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ricky Woolstenhulme; and Michael Pickering; <br><br> Plaintiffs, <br><br> v. <br><br> MasTec, Inc., a Delaware corporation; and <br><br> EC Source, a wholly-owned subsidiary of MasTec, Inc., <br><br> Defendants. | Case No. <br><br><br><br><br> **COMPLAINT** <br><br> (Jury Trial Demanded) |

Plaintiffs Ricky Woolstenhulme and Michael Pickering, as and for their complaint

against Defendants MasTec, Inc. and EC Source, allege as follows:

**<u>Introduction</u>**

1.      On November 5, 2015, MasTec, Inc. fired Ricky Woolstenhulme and Michael Pickering in retaliation for their reports that executives at its electrical-transmission subsidiary, EC Source (ECS), had manipulated revenue recognition for multiple years.  MasTec hired Mr. Woolstenhulme in 2012 and Mr. Pickering in 2013 to work for its electrical-transmission construction subsidiaries, ECS and T&D Power (TDP). Early on in their tenures at MasTec, Plaintiffs found that ECS and TDP lacked the necessary internal controls for producing accurate financial information on their electrical-transmission projects.   They later learned that ECS executives were intentionally manipulating financial information in order to bolster their companies' financial performance as reported to MasTec.  MasTec incorporated this false financial information into its public financial disclosures.

2.      Plaintiffs repeatedly reported these problems first to ECS executives and then to MasTec executives, pointing out that this misconduct could lead to materially misleading statements to the public about the performance of MasTec's Electrical Transmission segment.  After MasTec's Audit Committee investigated Plaintiffs' reports, MasTec issued a restatement of its financial disclosures for three quarters in 2014.  In response to these substantiated reports, ECS executives retaliated against Plaintiffs by removing their responsibilities and executive job titles, excluding them from company operations, denying them bonuses and stock grants, forcing them to work from home, and finally terminating their employment, all with MasTec's knowledge and approval.

3.     MasTec's retaliation has caused the Plaintiffs significant financial, reputational, and emotional harm.  For this reason, they bring this civil action against Defendants MasTec and ECS for monetary relief for the injuries they sustained as a result of the Defendants' retaliation against them in violation of the Sarbanes-Oxley Act (SOX Act), 18 U.S.C. § 1514A; the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), 15 U.S.C. § 78u-6(h); the Arizona Employment Protection Act (AEPA), A.R.S. § 23-1501; and in Mr. Pickering's case, in violation of California Labor Code § 1102.5(b) and California common law.

## **Jurisdiction and Venue**

4.     This Court has jurisdiction over certain of Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as those claims contain a federal question.

   a.  This Court has jurisdiction over Plaintiffs' SOX Act claims pursuant to 18 U.S.C. § 1514A(b)(1)(B), which permits the Plaintiffs to remove their claims from the Department of Labor to an appropriate United States District Court if the Secretary of Labor has not issued a final decision within 180 days after Plaintiffs filed their complaint with the Occupational Safety and Health Administration (OSHA).  Plaintiffs filed their OSHA Complaint on April 29, 2016.

   b.  This Court has jurisdiction over Plaintiffs' Dodd-Frank Act claims pursuant to 15 U.S.C. § 78u-6(h)(1)(B)(i).

5.     This Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

6.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial number of the events or omissions giving rise to Plaintiffs' claims occurred in the federal District of Arizona.

**Parties**

8.     Plaintiff Ricky Woolstenhulme is an adult resident of the State of Arizona. He was employed by MasTec's Electrical Transmission segment, first by TDP and then by ECS, in Mesa, Arizona from February 14, 2012 until November 5, 2015.

9.     Plaintiff Michael Pickering is an adult resident of the State of California. He was employed by MasTec's Electrical Transmission segment, first by TDP and then by ECS, from April 9, 2013 through November 5, 2015. Between April 9, 2013 and November 3, 2014, Mr. Pickering worked in Mesa, Arizona. From November 3, 2014 through November 5, 2015, Mr. Pickering worked exclusively from his home in California.

10.     MasTec, Inc. is a Delaware Corporation that is publicly traded on the New York Stock Exchange. MasTec's corporate headquarters is located at 800 S. Douglas Road, 12th Floor, Coral Gables, FL 33134.

11.     ECS is a wholly owned subsidiary of MasTec that maintains an office in Arizona located at 1138 N. Alma School Road, Mesa, AZ 85201. TDP is a wholly owned

subsidiary of ECS.  ECS's financial information, including TDP's financial information, is included in MasTec's consolidated financial statements.

12.   At all times relevant to this complaint, MasTec and ECS were joint employers of Plaintiffs within the meaning of the SOX Act, 18 U.S.C. § 1514A; the Dodd-Frank Act, 15 U.S.C. § 78u-6(h); the AEPA, A.R.S. § 23-1501; the California Labor Code, Cal. Lab. Code § 1102.5(b); and California common law.

 a.   At all times relevant to this complaint, both MasTec and ECS maintained a right to control Plaintiffs' employment conditions, including but not limited to joint responsibility for Plaintiffs' hiring and termination, assigning work projects, determining work location, scope of job responsibilities, and decisions regarding salary and awards of bonuses.

 b.   At all times relevant to this complaint, MasTec controlled ECS as its wholly owned subsidiary, and there was significant commonality of management and operations between the two entities.  For example, the three top executives at ECS – Brian Bratton, Gary Pugh, and Rick Roton – all served simultaneously as MasTec executives.

 c.   At all times relevant to this complaint, Plaintiffs performed work to the benefit of both MasTec and ECS.

## Factual Allegations

13.   In 2011, MasTec acquired ECS, an engineering, procurement, and contracting program-management company.  As part of that acquisition, MasTec purchased ECS's subsidiary TDP, a company specializing in the construction of extra-

high-voltage (EHV) electrical systems.  MasTec's goal in this acquisition was to expand its services in the electrical-transmission field and together ECS and TDP constituted MasTec's Electrical Transmission segment.

14.     In February 2012, TDP President William Wright hired Mr. Woolstenhulme as TDP's Vice President because of his expertise in estimating and bidding EHV construction contracts.  When he joined TDP, Mr. Woolstenhulme had more than 40 years of experience in EHV construction, with particular expertise in estimating, bidding and managing large, complex electrical transmission projects.   As Vice President, Mr. Woolstenhulme's position centered on running TDP operations, which included creating winning competitive-bid proposals and ensuring the efficient operations of TDP projects. In early 2013, Mr. Woolstenhulme's title was changed to Senior Vice President.

> **A.      Plaintiffs Discover that MasTec's Electrical Transmission Segment Lacked the Necessary Internal Controls to Produce Accurate Financial Information.**

15.     Upon joining TDP, Mr. Woolstenhulme discovered it lacked the necessary operational controls over both financial management and projects.   TDP did not have critical-path-method scheduling in place to track the work of subcontractors, vendors, and suppliers, and to help monitor a project's overall financial progress and earned value of work performed.  TDP similarly lacked even basic project cost controls such as job cost reports, labor reports, and equipment reports.  All of these internal controls are necessary both for running a project profitably and for maintaining accurate financial information.

16.     In the past, TDP had successfully operated in this manner because it was a private company that worked on only one project at a time. ECS and TDP founder Martin

Maslonka and his brother Jon Maslonka were able to handle a project without accepted operating controls because both were veterans of the electrical-transmission construction field.  With the MasTec acquisition, two things changed that made further operational controls essential.  First, TDP and ECS became part of a public company, requiring their financials to be reported accurately to shareholders.  Without operational controls, MasTec's financials for its Electrical Transmission segment were not reliable or verifiable.  Second, without operational controls, MasTec's Electrical Transmission segment was not able to properly run the multiple projects it took on, which resulted in cost overruns, reduced profits, and, in one case, extensive litigation.

17.    Because he understood the critical need for internal controls for MasTec's Electrical Transmission segment to successfully execute multiple projects, Mr. Woolstenhulme took steps to institute the needed operational controls, which included creating an Operations group under his management.  The Operations group eventually included approximately 30 employees.

18.    As part of the build out of the Operations group, on April 8, 2013, Mr. Woolstenhulme hired Mr. Pickering as Director of Contracts and Internal Controls to manage contract policies and processes, assist in contract issues and disputes, and develop and implement internal-controls procedures.  Mr. Pickering had more than 25 years of experience in contract management, project management, and business operations, with particular expertise in establishing internal-controls procedures for multi-million dollar electrical-systems projects.  Mr. Pickering managed the Controls group of approximately 12 employees, which was part of Mr. Woolstenhulme's Operations group.

19.     During Mr. Pickering's first few months on the job, at the direction of Mr. Woolstenhulme, he began to assess the status of TDP's operational controls and found serious deficiencies, many of which directly affected TDP's, and therefore MasTec's, ability to maintain and report accurate financial information.  These deficiencies included: failure to ensure that customers paid for expanded scope of work, including by neglecting to issue required "change orders" on contracts, resulting in customer challenges to invoices, higher costs to TDP, and most importantly the inability for TDP to reliably estimate revenue levels on those contracts; failure to recognize and manage contractual risks, resulting in unexpected and unbudgeted costs, again resulting in unreliable revenue estimates; failure to adequately log and address customer requests for information; and employing unqualified personnel in key positions, including executive positions responsible for producing revenue estimates.  Each of these deficiencies impeded Defendants' ability to maintain and to accurately report material financial information to MasTec shareholders.

**B.      Plaintiffs Discover that MasTec's Electrical Transmission Segment Knowingly Recognized Revenue Improperly.**

20.     The lack of internal controls was not the only problem Plaintiffs discovered related to MasTec's Electrical Transmission segment's financial reporting.  During the time period relevant to this complaint, MasTec asserted in its filings with the Securities and Exchange Commission (SEC) that it used the percentage-of-completion (POC) method for construction accounting, in conformance with Generally Acceptable Accounting Principles (GAAP), in determining when and in what amounts to recognize revenue on its electrical transmission projects.  Under Accounting Standards Codification (ASC) 605-35,

which articulates the GAAP standards for recognizing revenue pursuant to the POC method, a company can use the POC method only if it has the ability to make reasonably dependable estimates of the extent of progress towards completion, contract revenues, and contract costs. These reasonably dependable estimates must be updated continually as work progresses. If a company cannot confidently generate such estimates as needed on a continual basis, it cannot meet GAAP requirements for using the POC method, and instead can recognize revenue only at the completion of the contract. Additionally, if a company's reasonably dependable estimate indicates it will take a loss on a contract, the company has to recognize that loss in the period in which it becomes evident.

21.     In or around September 2013, Plaintiffs learned that MasTec's Electrical Transmission segment was improperly recognizing tens of millions of dollars of revenue on a project called the "Susquehanna-Roseland 500/230kV Transmission Line" for Pennsylvania Power & Light (referred to herein as the "PPL project"). In 2012, PPL had awarded the project to TDP for a lump-sum, fixed price of approximately $205.7 million, with a projected margin for TDP of $40 million. By the terms of the contract, upwards adjustments to the fixed price were permissible only with the issuance of PPL-authorized change orders. Any work not specified by the contract that TDP performed without a PPL-approved change order was performed at TDP's sole risk and expense.

22.     From the beginning of the project, TDP incurred higher than budgeted-for costs, and PPL refused to pay for the increased costs because TDP had performed the work without first receiving PPL's approval through a change order. As a result, TDP incurred significant cost overruns for which it could not reasonably rely upon as additional revenue,

and thus could not recognize that revenue consistent with the POC method of accounting. In August 2013, Mr. Woolstenhulme conducted an analysis of accrued and expected costs and determined that the PPL project had already run some $20 to $25 million over budgeted costs as of August 2013.  He projected that TDP would incur an additional $40 to $50 million in unbudgeted costs through completion of the contract, resulting in some $60 to $75 million in cost overruns over the course of the contract. This would mean that, rather than earning the expected $40 million in profit on the contract, MasTec could expect to lose approximately $20 to $35 million.

23.     In or around mid-August 2013, Mr. Woolstenhulme provided TDP President Wright with a copy of his analysis.  In the days following, Plaintiffs discussed the analysis at some length with Mr. Wright.  They explained that TDP needed to revise its cost and revenue estimates because PPL had made clear that it would not compensate TDP for the cost overruns, making recovery of that revenue not reasonably dependable.  They explained that the company then needed to revise its POC analysis to reflect these new estimates and evaluate whether the contract was now in an overall loss position, and, if so, record the loss on TDP's books in the current period when it had become known.

24.     Upon information and belief, Mr. Wright shared Mr. Woolstenhulme's analysis and Plaintiffs' recommendations with ECS President Brian Bratton and ECS Chief Financial Officer Gary Pugh, both of whom were also MasTec executives.  During this same time period, Mr. Pugh sent Plaintiffs emails asking for confirmation that it was reasonably likely that PPL would compensate TDP for the additional costs it had incurred.

On each occasion, Plaintiffs responded that it was not reasonably likely, since the PPL owner had expressly refused to pay.

25.     In September 2013, PPL terminated its contract with TDP without providing a reason.  TDP sued PPL to recover the additional costs and associated margin it claimed PPL owed it under the contract, even though PPL had never approved the out-of-scope work.  Mr. Wright directed Plaintiffs to assist MasTec's outside counsel by providing them the factual information and documentation needed for the litigation, while also continuing with their regular duties and responsibilities.

26.     On October 5, 2013, Mr. Wright gave Plaintiffs a copy of the work-in-progress (WIP) report for the terminated PPL project.  WIP reports as generated by MasTec's Electrical Transmission segment show how far along each aspect of a project is, the job costs to date, and the estimated cost at completion at a given time so that the project's accountants can make reasonably dependable estimates of the project's overall cost at completion.  Mr. Pickering noted that the cost and POC estimates for the PPL project neither reflected the actual project costs nor contained accurate cost-to-complete estimates.  Without that information, TDP could not generate the "reasonably dependable" cost-at-completion estimates that were necessary to conduct a POC analysis to determine the proper amount of revenue to recognize.  Within a few days of receiving the report, Mr. Pickering met with Mr. Wright to discuss his concerns.  He asked Mr. Wright if TDP would be revising the project's cost estimates to reflect the actual costs to date.  Mr. Wright stated that the project would "cost what it will cost" and that TDP would not revise its cost or its

POC analysis, even though ECS executives knew that the cost figures were incorrect, making the POC analysis incorrect.

27.    The PPL project was not the only project on which MasTec failed to properly follow the POC method when recognizing revenue.   In 2013, ECS was awarded the contract on a project called the "MVP 3 & 4 345/161kV Transmission Line" for Mid-American Electric Power (referred to herein as the "Mid-American project"). Shortly after ECS won the contract in the spring of 2013, Plaintiffs learned that Mr. Bratton had directed Mr. Wright to increase the project's profit estimate from six percent to 13 percent.  Mr. Bratton's directive did not appear to rest on new data showing that the project could be completed at a lower cost than initially projected.   Mr. Wright managed to increase the budgeted profit margin, but only by dramatically cutting projected labor hours required on the project, even though the most reliable estimates indicated that more labor hours, not fewer, would be required.

28.    Making matters worse, the project then suffered a costly three-to-four month delay due to the owner's failure to secure the appropriate licensing for the project.  The delay caused significant cost overruns due to the personnel and equipment that ECS had mobilized during the period of delay.  Rather than seek payment for these costs from Mid-American as Plaintiffs suggested to Mr. Wright and ECS Vice President of Strategic Relations Brian Smaistrla, ECS attempted to hide the cost overruns by improperly billing the owner for work not yet completed and by improperly recognizing revenue for materials it had purchased but not yet installed.

29.     Between the fall of 2013 and August 2014, Plaintiffs raised concerns with Mr. Wright, Mr. Bratton, and Mr. Smaistrla about the unrealistic margin the company had projected for the Mid-American project, the company's attempt to hide cost overruns by improperly billing the owner for yet to be performed work, and the company's improper revenue recognition, but ECS took no action to correct the problems.  In response, by the end of summer 2014, these ECS executives had excluded Plaintiffs from the project altogether.

30.     ECS management's refusal to heed Plaintiffs' suggestions for improved internal controls and project management was particularly frustrating to Mr. Pickering and Mr. Woolstenhulme because they were using their proposed measures to lead what may have been MasTec's most successful electrical-transmission project ever, the Arizona Public Service Company's Hassayampa – North Gila #2 500kV Transmission Line Project ("APS Project").  Mr. Woolstenhulme had developed the bid in mid-2013 and managed the project from the time the company won it in August 2013.  In this project Plaintiffs implemented internal controls and project-management measures such as critical-path-method scheduling, a risk analysis program, and a procedure for processing change orders.  Although the project faced many of the same issues that had run up costs unrecovered on other projects, these measures allowed ECS to earn a 35 percent margin on the APS project ($26.5 million in profit on $74.5 million in revenue).  Enforcing a change-order policy alone allowed ECS to recover $9.5 million in revenues which on other projects would have been written off.

**C.**     **Plaintiffs Discover that MasTec's Electrical Transmission Segment is Intentionally Recognizing Revenue Improperly to Bolster Its Financial Performance.**

31.     In October 2013, Mr. Wright, who by then MasTec had promoted to the position of ECS Chief Operating Officer, assigned Mr. Woolstenhulme responsibility for generating the WIP reports for each TDP project and for certain other ECS projects.  This assignment gave Mr. Woolstenhulme access for the first time to financial information about each project on which ECS was working, and gave Mr. Pickering access to the Timberline construction software that ECS accountants used to maintain detailed financial information for projects.  Mr. Woolstenhulme's experience with the PPL project had taught him that MasTec's Electrical Transmission segment lacked the internal controls to generate accurate POC estimates.  With this new responsibility, Mr. Woolstenhulme's access to financial information expanded and his interaction with the ECS accounting department increased, which revealed an even more serious problem – that ECS management was willfully manipulating the financial information it provided to MasTec, which was incorporated in the financial disclosures that MasTec made to shareholders.

32.     Mr. Woolstenhulme's preparation of WIP reports on MasTec's Electrical Transmission segment projects began with him receiving the preliminary reports from ECS's accounting department, which showed POC figures from the previous month, with the data listed by assigned cost codes.  He would then assign Mr. Pickering's Controls group to: review current data from the critical path management schedule and the financial information stored in the Timberline software; speak with project managers; and then generate updated POC figures for each cost code for the current month, adjusting

projections up or down as appropriate.  Mr. Woolstenhulme would then send draft WIP reports for the current month to the accounting team with handwritten POC figures for each cost code.

33.     On November 8, 2013, soon after Mr. Woolstenhulme assumed his role in the WIP reporting process, an ECS accountant distributed preliminary October 2013 WIP reports for open projects to Mr. Wright, Mr. Bratton, Mr. Woolstenhulme, Mr. Smaistrla, and to the accounting staff, including ECS Controller and Director of Accounting Christine Golden and TDP Senior Financial Analyst Cynthia Glauner.  Ms. Golden requested that the ECS executives review and update the reports as needed, but Mr. Bratton responded to the group stating that he expected only Mr. Smaistrla or Mr. Wright to work with accounting on the WIP reports.  Mr. Bratton explained that no one else should be "completing percentages which drive our earnings" because "[o]ur production curves are not set to match the budget, therefore one cannot simply take the field notes and apply then [sic] unilateral[sic] to the WIP reports."  In this statement, Mr. Bratton as much as admitted that ECS intended to manipulate the WIP reports to ensure that the information in the reports matched the budgeted earnings rather than the accurate estimates of work completed and cost to completion estimates as required under GAAP.

34.     Plaintiffs observed ECS management's deliberate manipulation of WIP reports on several projects in late 2013 and early 2014.  The most egregious manipulation involved accounting on a project for the Pacific Corporation called the "Sigurd-Red Butte 345kV Transmission Line" (referred to herein as the "S2RB project").  ECS had won the project in 2012 at a firm fixed-price contract for approximately $190 million.  Prior to the

summer of 2013, Mr. Wright had managed the project himself, with input from Mr. Bratton and Mr. Smaistrla, but with no direct involvement of the Plaintiffs.  This changed when Mr. Wright assigned Mr. Woolstenhulme to prepare WIP reports for MasTec's electrical transmission projects.

35.     On his first attempt to generate the WIP report for the S2RB project in November 2013, Mr. Woolstenhulme saw that the preliminary POC figures for several cost codes were significantly inflated, suggesting that ECS was further along in completing the project than it actually was.  He collected the correct data, revised the cost calculations, and submitted a revised report to Ms. Golden with lower POC figures for October 2013. Ms. Golden responded by returning the report to him with POC figures that were higher but were unsupported by data.  The POC figures, apparently fabricated, brought the projected cost-at-completion estimate down to the budgeted level even though the actual costs accrued to date indicated that the cost at completion would actually be much higher, and MasTec's profit much lower, than the company had forecasted. When Mr. Woolstenhulme asked Mr. Wright how to proceed with the unsupported projections, Mr. Wright directed him to look for ways to justify the numbers. Despite lacking legitimate justification for the adjustments, Mr. Woolstenhulme did as instructed and resubmitted the report to Ms. Golden with her revised figures.  As a result of Controller and Director of Accounting Golden's insistence on manipulating the October 2013 WIP report on the S2RB project, ECS falsely reported lower costs and higher profits for the month to MasTec for the S2RB project than were actually warranted.

36.     Mr. Woolstenhulme saw this process repeated in December 2013: he submitted accurate POC figures reflecting significant cost overruns, and Ms. Golden adjusted the costs downward and the POC figures upward to match the budget and inflate the profit that MasTec could expect to earn on the project.  Frustrated at management's determination to reject his efforts to provide reasonably dependable estimates of the percentage of completion for the S2RB project, Mr. Woolstenhulme undertook a detailed analysis of the project's projected cost at completion, and asked the Controls group to double-check his projections by conducting its own detailed analysis. The result was disturbing.  While ECS's final WIP reports were claiming that costs on the S2RB project were in line with the project budget, Mr. Woolstenhulme's analysis showed cost overruns of $35 to $40 million, and the Controls group's more-detailed analysis projected $45 to $55 million in overruns.

37.     Also in December 2013, Plaintiffs requested and received a transfer of their formal employment relationship from TDP to ECS, as they were now working directly with ECS management on a number of projects.   Mr. Wright agreed, and Mr. Woolstenhulme became an ECS Senior Vice President and Mr. Pickering an ECS Executive Director.  In his new position, Mr. Woolstenhulme used his direct reporting relationship with ECS executives to escalate his concerns regarding the accounting practices related to the S2RB project.  In January 2014, he presented the Controls group's POC analysis to Mr. Wright.  Plaintiffs then had several discussions with Mr. Wright and Ms. Glauner in which they explained the inaccuracy of the POC figures in the S2RB WIP reports, which were the foundation for the financial information that ECS submitted to

MasTec.  Mr. Woolstenhulme went over the same points in a February 15 conference call with Mr. Bratton, Mr. Smaistrla, Mr. Pugh, and Ms. Golden, and insisted that ECS adjust the estimated cost at completion to reflect correct POC accounting.  Based on Mr. Woolstenhulme's comments, the ECS executives agreed to increase the cost-at-completion estimate by $10 to $12 million, but they instructed Mr. Woolstenhulme to increase the projection gradually, at the rate of $2 million per month over five months so as to make it less noticeable to MasTec leadership and to MasTec shareholders, even though GAAP required that they immediately disclose the corrected estimate.

38.     As it turned out, ECS backtracked even on this modest correction, removing almost all the $2 million increases from the final WIP reports it submitted to MasTec for February, March and April 2014.  As a result, MasTec's financials reflected only $3 to $4 million in increased cost-at-completion projections, only a fraction of the $10 to $12 million that ECS executives had agreed to and far less than the $34 million or so that Plaintiffs insisted was needed.

39.     Despite ECS management's distaste for using accurate cost data on the S2RB project, Mr. Woolstenhulme's Operations group continued to update their POC analyses for the project into the summer of 2014.  At that time, they determined that ECS was underestimating the project's cost at completion by $34 million.  When Mr. Woolstenhulme reported these findings to Ms. Golden in June 2014, she dismissed his view that ECS needed to adjust the projected cost at completion upward, telling him that the costs would "all wash out in the general ledger."

40.     In early August 2014, Mr. Woolstenhulme decided after consultation with Mr. Pickering that he could no longer participate in the preparation of WIP reports given ECS management's insistence on false reporting of cost data and the related POC analysis on electrical transmission projects. On August 8, 2014, he emailed ECS's accounting team, with copies to Mr. Wright, Ms. Golden, and Mr. Smaistrla, stating that all of the POC estimates "are drastically overstated and any further adjustments to meet accounting needs, should be made by accounting."  He received no response to his email.  Instead, ECS's accounting team simply excluded him from the process and continued to list inflated POC figures in the WIP reports for August and September 2014, despite receiving cost data from the Operations team to the contrary.

**D.     Defendants Retaliate against Plaintiffs for Raising Concerns about Accounting Fraud.**

41.     In response to Plaintiffs raising concerns that ECS was reporting false and inaccurate financial information to MasTec, ECS executives launched a campaign of retaliation against them that culminated in their terminations.  In or around mid-February 2014, Ms. Golden warned Mr. Woolstenhulme that the preliminary WIP report he submitted for the S2RB project for April fell short of ECS's budget forecasts and that "heads will roll" if the report did not mirror those forecasts.  On another occasion in mid-2014, during a conference call with Mr. Bratton and Mr. Wright, Mr. Woolstenhulme explained his objections to ECS's POC practices.  In response, Mr. Bratton warned Mr. Woolstenhulme that he had replaced team members in the past in order to build a team willing to do what he wanted, and he threatened to do so again if need be, implying that he

would terminate Mr. Woolstenhulme if he did not go along with ECS's financial manipulations.

42.     In September 2014, only a month after Mr. Woolstenhulme refused to participate in the WIP report process because of the financial manipulation, Mr. Roton, who was now MasTec's Executive Vice President for the Electrical Transmission segment, met with Mr. Woolstenhulme's subordinates in his absence and informed them that they now would be reporting to him, not to Mr. Woolstenhulme.  Mr. Roton never notified Mr. Woolstenhulme of this significant downgrade in his responsibilities.  Mr. Woolstenhulme learned that ECS had stripped him of his supervisory responsibilities only when his team members informed him of the meeting and that they no longer were reporting to him.

43.     On October 6, 2014, Ms. Glauner emailed Ms. Golden with questions about the improper accounting Plaintiffs had opposed.   Ms. Golden replied by criticizing Plaintiffs' credibility and competence, stating that "the information provided by those individuals has never been used."  Mr. Pickering's access to Timberline was revoked without explanation the same day, effectively cutting off his access to detailed financial information about ECS and TDP projects.

44.     On October 22, 2014, Mr. Pickering sent an email to Mr. Woolstenhulme, his direct supervisor, complaining about ECS management's "dishonesty, misinformation, misappropriation, mismanagement, retaliation and the failure to observe MasTec, Inc. Code of Business Conduct and Ethics and PMI's Code of Ethics and Professional Conduct."  Mr. Woolstenhulme forwarded Mr. Pickering's email to Alberto de Cardenas, MasTec's Executive Vice President, General Counsel, and Corporate Secretary.  In doing

so, Mr. Woolstenhulme followed ECS company policy directing employees to report any such ethical concerns to the General Counsel's office in the MasTec legal department.  In his forwarding email to Mr. de Cardenas, Mr. Woolstenhulme noted that he shared Mr. Pickering's concerns, and that the email represented a formal notification to MasTec of Plaintiffs' concerns about the company's business practices.  Neither Mr. Pickering nor Mr. Woolstenhulme was seeking legal advice in contacting Mr. de Cardenas.  In response, Mr. de Cardenas asked Plaintiffs to describe their concerns in greater detail.

45.     On October 23, 2014, Mr. Woolstenhulme emailed Mr. de Cardenas a detailed list of concerns about ECS's practices on behalf of himself and Mr. Pickering.  The email consisted of seven bullet points: dishonesty, misinformation, misappropriation, mismanagement, retaliation, failure to observe the MasTec Code of Business Conduct and Ethics, and failure to observe Project Management Institute's (PMI's) Code of Ethics and Professional Conduct.  Plaintiffs provided examples of each type of behavior, including the manipulation of project forecast data to misrepresent revenues, the concealment of losses, the failure to accurately calculate project costs, and the unexplained revocation of access to financial reporting of those who objected to such practices.  On October 27, 2014, Mr. de Cardenas and Associate General Counsel Virginia Pagliery spoke with Plaintiffs by telephone and Plaintiffs provided them additional details about their reports of unlawful and unethical conduct.

46.     After their report, Plaintiffs immediately faced escalating retaliation.  On November 3, 2014, Mr. Roton sent each of the Plaintiffs an email with the subject line "Notification of Temporary Re-Assignment."  The emails informed them they would

remain full-time employees of ECS as "Senior Members" of the PPL litigation team, working from home.  Though they were to continue reporting to Mr. Wright, in nearly every regard, the reassignment was a demotion for each of the Plaintiffs.  Prior to this reassignment, Plaintiffs had held executive-level positions with significant responsibilities for the management of large multi-million dollar projects.  Both had supervised employees: Mr. Woolstenhulme had managed the Operations group of more than 30 people, and Mr. Pickering had managed approximately 12 people who comprised the Controls group within the Operations group.  After the reassignment, Plaintiffs had no project-related responsibilities and no longer estimated or bid on new work despite the fact that MasTec remained focused on the growth of its Electrical Transmissions segment.

47.  On the same day that they received Mr. Roton's email, Plaintiffs reported the reassignment to Mr. de Cardenas, emailing him to say they thought the move was retaliatory.  In an email the next day, Mr. de Cardenas dismissed their concerns, saying the reassignment was already in the works and that they were needed on the PPL litigation team.  This response ignored the fact that Plaintiffs had objected to ECS management's financial misconduct for over a year prior to reporting it to MasTec's legal department, and that ECS management had been retaliating against them for months.

48.  Ten days after his reassignment, Mr. Woolstenhulme faced further retaliation.  When Mr. Woolstenhulme joined the company, he and Mr. Wright had orally agreed that he would receive 5,000 shares of MasTec stock per year, beginning with 5,000 shares at the start of his employment and then an additional 5,000 shares granted annually on the date of his work anniversary.  When in November 2014 Mr. Woolstenhulme

accessed the E*TRADE brokerage account that supposedly held his stock grants, he discovered that MasTec had shorted him his initial and subsequent yearly grants of 5,000 shares, as well as 1,200 shares that MasTec CEO José Mas had granted him in mid-2014. Mr. Woolstenhulme did not receive his promised annual stock grant in 2015. To date, MasTec has not provided the promised missing shares to Mr. Woolstenhulme.

49.     In December 2014, Plaintiffs learned that ECS was not only requiring them to work from home, but that it was also denying them work space at the company's new offices. That month MasTec moved its Electrical Transmission segment office to a new building in Mesa, Arizona. On December 12, 2014, Kim Hightower, ECS Officer Manager, sent an email to all Mesa office personnel (except Plaintiffs) describing a new office layout which did not include work space for Plaintiffs. Two days later, on December 14, 2014, Mr. Roton emailed the entire ECS management team and employees who had reported to Plaintiffs, regarding a "re-alignment" of the MasTec Electrical Transmission Procurement Group. The email made no mention of Plaintiffs, who were not included on the distribution list, and they found out about the email only when a colleague forwarded it to them.

50.     MasTec's retaliation against Plaintiffs continued into the new year. On January 12, 2015, Mr. Roton emailed Plaintiffs and instructed them to begin providing him with a weekly summary of their daily activities, including an hourly accounting. As executives, the company had never before required them to provide such a summary, and, upon information and belief, had never required other executives to do so.

51.     By email on January 14, 2015, Plaintiffs reported to Mr. de Cardenas that ECS management had stripped them of their offices and that Mr. Roton was requiring them to submit weekly accountings of their work.  Mr. de Cardenas responded that MasTec was taking their complaints seriously and had retained independent counsel to investigate.  Mr. de Cardenas also asked them for any additional information or documentation they had regarding their original complaint.  Mr. Woolstenhulme responded by sending information about ECS management's direction to him to manipulate the POC numbers in the WIP report process and also about the lack of internal controls discussed above.

52.     On January 28, 2015, Plaintiffs met with outside investigators hired by MasTec to investigate their reports of ECS's financial improprieties.  During the interview, Plaintiffs again detailed the accounting manipulations and the deficient internal controls that prevented accurate POC accounting.

53.     Also on January 28, Mr. de Cardenas met with Plaintiffs informally and pointed out that they might face retaliation if they returned to their previous positions after the investigation.  Mr. de Cardenas asked if they would be interested instead in positions with MasTec's corporate offices.  Both Plaintiffs indicated that they would, but Mr. Cardenas never got back to them about other MasTec positions.

54.     On February 26, 2015, MasTec announced its 2014 fourth quarter and 2014 year-end financial results.  In that announcement, MasTec disclosed that the Audit Committee of its Board of Directors, with the assistance of independent counsel, was reviewing its revenue recognition related to cost-to-complete estimates, which required it to delay filing its annual Form 10-K with the SEC.

55.     By April 2015, neither Plaintiff had received bonuses for 2014 as they had in prior years.  On April 7, 2015, Mr. Pickering contacted Mr. Wright to inquire about his 2014 bonus.  Mr. Wright claimed the bonus was merely delayed, but neither Mr. Pickering nor Mr. Woolstenhulme received a bonus for 2014 or an explanation for the denial.

56.     Also in April 2015, Plaintiffs learned that the Audit Committee of the MasTec Board of Directors was conducting an audit prior to filing its 2014 annual Form 10-K.  According to Charles Niemeier, the lawyer hired by the Audit Committee to conduct the investigation, the audit was a direct response to the concerns Plaintiffs had raised regarding internal controls and POC accounting.  In mid-April, the audit team invited Mr. Woolstenhulme to meet with them but did not invite Mr. Pickering.  It was only after Mr. Woolstenhulme insisted that Mr. Pickering's knowledge and analysis were critical to any effective investigation that the audit team scheduled a meeting with both Plaintiffs for May 19, 2015.

57.     On May 13, 2015, Plaintiffs spoke on the telephone with Mr. de Cardenas about their concerns regarding the upcoming audit team interview, and requested that MasTec provide them with their own counsel for the duration of the investigation because they feared further retaliation by MasTec.  Mr. de Cardenas agreed that MasTec would pay for an attorney to represent Plaintiffs in the investigation.  MasTec hired Reid Godbolt of the Jones & Keller law firm, who attended the audit team interview as Plaintiffs' counsel.

58.     During the May 19, 2015 interview, Plaintiffs detailed the improper revenue recognition processes and internal control deficiencies that they had observed and reported, explaining that the company's revenue and cost recognition issues and internal control

problems were not limited to 2014, but rather went back to 2013 and likely 2012. That same day after the interview, Plaintiffs again spoke with Mr. Niemeier, who informed them that their January 28 interview was part of an investigation into Plaintiffs' conduct, not the misconduct they had reported or the retaliation they had suffered as a result of their reports.

59.     After their May 19 meeting, Plaintiffs heard little or nothing more from MasTec about the investigation and MasTec never informed Plaintiffs of its outcome. On July 30, 2015, MasTec announced that the Audit Committee conducted a "detailed review of percentage-of-completion accounting at the Company's Electrical Transmission segment," which had resulted in MasTec restating its financial disclosures for three quarters in 2014. On July 31, 2015, MasTec filed its 2014 annual report, which included the restated financial information for the first three quarters of 2014.

60.     During the summer of 2015, Plaintiffs continued to have no work outside their PPL-litigation related duties, and by early August MasTec was excluding them from that work as well. After August 4, 2015, Plaintiffs were no longer included on the weekly PPL litigation team calls, with no explanation. In response, Plaintiffs requested weekly meetings with Mr. Wright, who agreed but then failed to attend most of these meetings.

61.     On September 4, 2015, through counsel, Plaintiffs submitted a Form TCR ("Tip, Complaint or Referral") to the SEC Office of the Whistleblower reporting that MasTec had knowingly recognized revenue on its electrical transmission projects improperly, and that the company lacked the necessary internal controls to produce accurate financial statements.

62.     On October 1, 2015, Mr. Wright canceled his scheduled weekly meeting with Plaintiffs.  After that date, Plaintiffs had no contact with Mr. Wright, even though he was their direct supervisor.

63.     On October 13, 2015, Plaintiffs learned that MasTec had settled its lawsuit against PPL.  On October 15, 2015, Mr. Niemeier informed Mr. Godbolt that MasTec was attempting to find positions for Plaintiffs at corporate headquarters.  This was the last Plaintiffs heard of such opportunities.

64.     On November 4, 2015, Plaintiffs found their MasTec email access suspended.  On November 5, Mark Cheskin, an attorney for MasTec, contacted Mr. Godbolt by telephone and informed him that MasTec was terminating Plaintiffs' employment effective as of that date, indicating that the terminations were due to lack of work since the PPL litigation had resolved.  Mr. Cheskin sent Mr. Godbolt a follow-up email that day confirming Plaintiffs' terminations as of that date.

## COUNT I

### (RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT, 18 U.S.C. § 1514A) (By Both Plaintiffs Against All Defendants)

65.     Paragraphs 1–64 above are hereby incorporated by reference as if set forth fully herein.

66.     The Sarbanes-Oxley Act, 18 U.S.C. § 1514A (SOX Act), prohibits a publicly traded company, including its subsidiaries and affiliates, from discriminating against an employee for reporting information that the employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities or commodities fraud, a violation of any SEC rule

or regulation, or any provision of federal law relating to fraud against shareholders, when the information is provided to a federal regulatory or law enforcement agency, a person with supervisory authority over the employee, or any other person working for the employer who has the authority to investigate, discover, or terminate misconduct.

67.     Defendant MasTec is a covered employer under the SOX Act because it is a publicly traded company.  Defendant ECS is a covered employer under the SOX Act since it is a subsidiary or affiliate of a publicly traded company (Defendant MasTec) whose financial information is included in Defendant MasTec's consolidated financial statements. As detailed in paragraph 12, Defendants were joint employers of Plaintiffs.

68.     Plaintiffs were employees of Defendants.

69.     Plaintiffs engaged in protected activity when they reported to ECS executives, MasTec's legal department, and the Audit Committee of the MasTec Board of Directors their reasonable and good-faith belief that MasTec's Electrical Transmission segment, *i.e.* ECS and TDP, was manipulating the financial information they reported to MasTec, that it lacked the internal controls to keep accurate financial information, and that company executives had retaliated against them because they had reported these potential securities violations.  Plaintiffs also engaged in protected activity when they reported these potential securities violations and retaliation to the SEC.  The covered laws and regulations implicated by Defendants' misconduct include, but are not limited to:

- Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibit

fraudulent practices in connection with the purchase or sale of a security, including the knowing misrepresentation or omission of material facts;

- Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and associated SEC Rule 13a-1, 17 C.F.R. § 240.13a-1, and SEC Rule 13a-13, 17 C.F.R. § 240.13a-13, which require publicly traded companies to file annual and quarterly reports that cannot be misleading;

- SEC Rule 12b-20, 17 C.F.R. § 240.12b-20, which requires publicly traded companies to correct materially false or misleading statements or omissions in documents filed with the SEC;

- Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), and associated SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, which require publicly traded companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and the disposition of their assets;

- Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B)(2), and associated SEC Rule 13a-15, 17 C.F.R. § 240.13a-15, which require publicly traded companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability of assets; and

- 18 U.S.C. § 1343, which prohibits fraud by wire.

70.     In retaliation for Plaintiffs engaging in this protected activity, Defendants demoted them, denied them bonuses and stock grants, stripped them of their offices and forced them to work from home, investigated them without justification, and ultimately terminated their employment.

71.     Defendants' actions have caused and will continue to cause Plaintiffs substantial economic loss, including lost salary, bonuses, benefits, stock grants, and other compensation, damage to their professional reputation, and emotional distress.

## **COUNT II**

### **(RETALIATION IN VIOLATION OF THE DODD-FRANK ACT, 15 U.S.C. §78u-6(h)) (By Both Plaintiffs Against All Defendants)**

72.     Paragraphs 1–71 above are hereby incorporated by reference, as if set forth fully herein.

73.     Under the Dodd-Frank Act, 15 U.S.C. § 78u-6(h), it is unlawful for an employer to retaliate against an employee for providing information to the SEC or for making any disclosures relating to a possible violation of a law, rule, or regulation subject to the jurisdiction of the SEC or protected by the SOX Act's anti-retaliation provision.

74.     Plaintiffs were employees of Defendants.   As detailed in paragraph 12, Defendants were joint employers of Plaintiffs.

75.     Plaintiffs engaged in protected activity when they reported to ECS executives, MasTec's legal department, and the Audit Committee of the MasTec Board of Directors their reasonable and good-faith belief that MasTec's Electrical Transmission segment, *i.e.* ECS and TDP, was manipulating the financial information they reported to

MasTec, that it lacked the internal controls to keep accurate financial information, and that company executives had retaliated against them because they had reported these potential securities violations.  Plaintiffs also engaged in protected activity when they reported these potential securities violations and retaliation to the SEC.  The covered laws and regulations implicated by Defendants' misconduct include, but are not limited to:

- Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibit fraudulent practices in connection with the purchase or sale of a security, including the knowing misrepresentation or omission of material facts;

- Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and associated SEC Rule 13a-1, 17 C.F.R. § 240.13a-1, and Rule 13a-13, 17 C.F.R. § 240.13a-13, which require publicly traded companies to file annual and quarterly reports that cannot be misleading;

- SEC Rule 12b-20, 17 C.F.R. § 240.12b-20, which requires publicly traded companies to correct materially false or misleading statements or omissions in documents filed with the SEC;

- Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), and associated SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, which require publicly traded companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and the disposition of their assets;

- Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B)(2), and associated SEC Rule 13a-15, 17 C.F.R. § 240.13a-15, which require publicly traded companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability of assets; and

- 18 U.S.C. § 1343, which prohibits fraud by wire.

76.    In retaliation for Plaintiffs engaging in this protected activity, Defendants demoted them, denied them bonuses and stock grants, stripped them of their offices and forced them to work from home, investigated them without justification, and ultimately terminated their employment.

77.    Defendants' actions have caused and will continue to cause Plaintiffs substantial economic loss, including lost salary, bonuses, benefits, stock grants, and other compensation, and damage to their professional reputation.

## COUNT III

### (RETALIATION IN VIOLATION OF THE ARIZONA EMPLOYMENT PROTECTION ACT, A.R.S. § 23-1501) (By Both Plaintiffs Against All Defendants)

78.    Paragraphs 1–77 above are hereby incorporated by reference as if set forth fully herein.

79.    The Arizona Employment Protection Act prohibits the termination of an employee for refusing to commit an act or omission that would violate the Arizona

Constitution or Arizona statutes or for disclosing that the employer, or an employee of the employer, has violated or will violate the Arizona Constitution or Arizona statutes, provided that the disclosure was made to either the employer or a representative of the employer who the employee reasonably believes has the authority to investigate and take action to prevent further violations.

80.   Plaintiffs were employees of Defendants.   As detailed in paragraph 12, Defendants were joint employers of Plaintiffs.

81.   Plaintiffs engaged in protected activity when they reported to ECS executives, MasTec's legal department, and the Audit Committee of the MasTec Board of Directors their reasonable and good-faith belief that MasTec's Electrical Transmission segment, *i.e.* ECS and TDP, was manipulating the financial information they reported to MasTec, that it lacked the internal controls to keep accurate financial information, and that company executives had retaliated against them because they had reported these potential securities violations.  Plaintiffs also engaged in protected activity when they reported these potential securities violations and retaliation to the SEC.  Arizona statutes implicated by Defendants' misconduct include, but are not limited to:

- A.R.S. § 13-2310, Arizona's general fraud statute, and A.R.S. § 44-1991, Arizona's statute against fraud in connection with the sale or purchase of securities, because Defendant ECS intentionally manipulated the financial information that it reported to Defendant MasTec, knowing that this information would be consolidated into Defendant MasTec's financial statements;

-33-

- A.R.S. § 10-1601, Arizona's corporate records statute, because Defendants MasTec and ECS did not maintain accurate accounting records, lacked the necessary internal controls to maintain accurate financial information, and intentionally manipulated that information;

- A.R.S. § 10-1620, Arizona's financial statements for shareholders statute, because Defendants MasTec and ECS falsely asserted in MasTec's yearly financial statements to shareholders that its financial statements were prepared on the basis of generally accepted accounting principles; and

- A.R.S. § 10-1631, Arizona's civil liability for false statements statute, because Defendants MasTec and ECS falsely asserted in MasTec's yearly financial statements to shareholders that its financial statements were prepared on the basis of generally accepted accounting principles.

82.    In retaliation for Plaintiffs engaging in this protected activity, Defendants demoted them, denied them bonuses and stock grants, stripped them of their offices and forced them to work from home, investigated them without justification, and ultimately terminated their employment.

83.    Defendants' actions have caused and will continue to cause Plaintiffs substantial economic loss, including lost salary, bonuses, benefits, stock grants, and other compensation, damage to their professional reputation, and emotional distress.

84.    The foregoing conduct of Defendants was done willfully, wantonly, maliciously and was the product of an evil hand guided by an evil mind and in reckless

disregard for Plaintiffs' rights and Plaintiffs are therefore entitled to recover punitive and exemplary damages in an amount to be determined at trial.

## COUNT IV

### (RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE § 1102.5(b)) (By Plaintiff Pickering Against All Defendants)

85.     Paragraphs 1–84 above are hereby incorporated by reference as if set forth fully herein.

86.     California Labor Code § 1102.5(b) prohibits retaliation against employees for disclosing information "to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct" what the employee reasonably believes to be a violation of state or federal law.

87.     Plaintiff Pickering was an employee of Defendants.  As detailed in paragraph 12, Defendants were joint employers of Plaintiff.

88.     Plaintiff Pickering engaged in protected activity when he reported to ECS executives, MasTec's legal department, and the Audit Committee of the MasTec Board of Directors his reasonable and good-faith belief that MasTec's Electrical Transmission segment, *i.e.* ECS and TDP, was manipulating the financial information it reported to MasTec, that it lacked the internal controls to keep accurate financial information, and that ECS executives had retaliated against him because he had reported these potential securities violations.  The laws and regulations implicated by Defendants' misconduct include, but are not limited to:

- Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibit fraudulent practices in connection with the purchase or sale of a security, including the knowing misrepresentation or omission of material facts;

- Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and associated SEC Rule 13a-1, 17 C.F.R. § 240.13a-1, and SEC Rule 13a-13, 17 C.F.R. § 240.13a-13, which require publicly traded companies to file annual and quarterly reports that cannot be misleading;

- Rule 12b-20, 17 C.F.R. § 240.12b-20, which requires publicly traded companies to correct materially false or misleading statements or omissions in documents filed with the SEC;

- Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), and associated SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, which require publicly traded companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and the disposition of their assets;

- Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B)(2), and associated SEC Rule 13a-15, 17 C.F.R. § 240.13a-15, which require publicly traded companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial

statements in conformity with GAAP and to maintain accountability of assets; and

- 18 U.S.C. § 1343, which prohibits fraud by wire.

89.    In retaliation for Plaintiff Pickering engaging in this protected activity, Defendants demoted Plaintiff Pickering, denied him bonuses and stock grants, stripped him of his offices and forced him to work from home, investigated him without justification, and ultimately terminated his employment.

90.    Defendants' actions have caused and will continue to cause Plaintiff Pickering substantial economic loss, including lost salary, bonuses, benefits, stock grants, and other compensation, damage to his professional reputation, and emotional distress.

91.    The foregoing conduct of Defendants was done willfully, wantonly, maliciously and was the product of an evil hand guided by an evil mind and in reckless disregard for Plaintiff Pickering's rights and Plaintiff Pickering is therefore entitled to recover punitive and exemplary damages in an amount to be determined at trial.

## COUNT V

### (RETALIATION IN VIOLATION OF CALIFORNIA COMMON LAW)
### (By Plaintiff Pickering Against All Defendants)

92.    Paragraphs 1–91 above are hereby incorporated by reference as if set forth fully herein.

93.    Under California common law, it is unlawful for an employer to terminate a person's employment in retaliation for the employee reporting to his supervisors conduct that the employee reasonably believed to be a violation of law.

94.     Plaintiff Pickering was an employee of Defendants.  As detailed in paragraph 12, Defendants were joint employers of Plaintiffs.

95.     Plaintiff Pickering engaged in protected activity when he reported to ECS executives, MasTec's legal department, and the Audit Committee of the MasTec Board of Directors his reasonable and good-faith belief that MasTec's Electrical Transmission segment, *i.e.* ECS and TDP, was manipulating the financial information it reported to MasTec, that it lacked the internal controls to keep accurate financial information, and that ECS executives had retaliated against him because he had reported these potential securities violations.  The laws and regulations implicated by Defendants' misconduct include, but are not limited to:

- Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibit fraudulent practices in connection with the purchase or sale of a security, including the knowing misrepresentation or omission of material facts;

- Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and associated Rule 13a-1, 17 C.F.R. § 240.13a-1, and SEC Rule 13a-13, 17 C.F.R. § 240.13a-13, which require publicly traded companies to file annual and quarterly reports that cannot be misleading;

- SEC Rule 12b-20, 17 C.F.R. § 240.12b-20, which requires publicly traded companies to correct materially false or misleading statements or omissions in documents filed with the SEC;

- Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), and associated SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, which require publicly traded companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and the disposition of their assets;

- Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B)(2), and associated SEC Rule 13a-15, 17 C.F.R. § 240.13a-15, which require publicly traded companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability of assets; and

- 18 U.S.C. § 1343, which prohibits fraud by wire.

96.     In retaliation for Plaintiff engaging in this protected activity, Defendants demoted him, denied him bonuses and stock grants, stripped him of his offices and forced him to work from home, investigated him without justification, and ultimately terminated his employment.

97.     Defendants' actions have caused and will continue to cause Plaintiff Pickering substantial economic loss, including lost salary, bonuses, benefits, stock grants, and other compensation, damage to his professional reputation, and emotional distress.

98.     The foregoing conduct of Defendants was done willfully, wantonly, maliciously and was the product of an evil hand guided by an evil mind and in reckless

disregard for Plaintiff Pickering's rights and Plaintiff Pickering is therefore entitled to recover punitive and exemplary damages in an amount to be determined at trial.

### **Requested Relief**

WHEREFORE, Plaintiffs demand a trial by jury and prays this Court for the following relief:

1.    Enter judgment in Plaintiffs' favor and against Defendants for retaliation in violation of 18 U.S.C. § 1514A, 15 U.S.C. § 78u-6(h), A.R.S. § 23-1501, Cal. Lab. Code 1102.5(b), and California common law;

2.    Order Defendants to reinstate Plaintiffs to their former positions or equivalent positions, or award them front pay in lieu of reinstatement;

3.    Award Plaintiffs two times back pay, including the value of lost benefits and equity;

4.    Award Plaintiffs compensatory damages in an amount to be proven at trial for the economic, reputational, and emotional harm that they have experienced as a result of Defendants' unlawful conduct;

5.    Award Plaintiffs punitive damages in an amount sufficient to punish Defendants for Defendants' willful and malicious conduct and deter future, similar violations;

6.    Award Plaintiffs reasonable attorneys' fees, litigation expenses, and costs; and

7.    Grant such other and further relief as the Court may deem appropriate.

## Jury Demand

8.      Plaintiffs request a jury trial on all issues.

DATED this 2nd day of November, 2016.

SCHLEIER LAW OFFICES, P.C.

/s/ Tod F. Schleier
Tod F. Schleier

KATZ, MARSHALL & BANKS, LLP.

/s/ David J. Marshall
David J. Marshall
Alexis Ronickher
*Attorneys for Plaintiffs*